No. 36,807

IN THE MATTER OF THE ACCUSATION FOR DISBARMENT OF
KENNETH K. COX IN DISBARMENT PROCEEDINGS.

(188 P. 2d 652)

Opinion filed January 24, 1948.

*Thomas M. Lillard,* secretary and counsel for the State Board of Law Examiners, argued the cause, and *Edward F. Arn,* attorney general, and *Charles H. Hobart,* assistant attorney general, were with him on the briefs for the accuser.

*Robert R. Hasty,* of Wichita, argued the cause, and was on the briefs for the respondent.

The opinion of the court was delivered by

WEDELL, J.: This is a disbarment proceeding filed by the board of law examiners pursuant to the provisions of G. S. 1935, 7-111 *et seq.* The accusation is appended to this opinion and made a part hereof.

Exhibits "A" and "B" of the accusation constitute respectively a

judgment finding respondent guilty of contempt of the district court' and order remitting a portion of the fine assessed by such judgment. Such exhibits are omitted for reasons to be stated presently.

It should also be stated at the outset that the accuser concedes that portion of the accusation which charges respondent with having advised his client, Trugillo, to testify falsely is not sustained by the record and the commissioner so ruled.

This court appointed the Honorable Jay W. Scovel as its commissioner to act in accordance with powers and duties prescribed by the act in disbarment cases. Following a summary of the evidence and a discussion thereof the commissioner made findings of fact, conclusions of law and a recommendation as follows:

### "FINDINGS OF FACT

"Your Commissioner finds the evidence established the following facts in this proceeding:

"1. Prior to January 11, 1945, respondent had been employed to and did file for Luis Trugillo an application for change of custody of his 14-year-old daughter, Carmen, in the case of *Oletha Trugillo vs. Luis Trugillo.*

"2. That on January 11, 1945, this application was denied and respondent requested that Carmen be allowed to remain where she then was for a few days.

"3. That within a very short time thereafter the girl was removed from the jurisdiction of the Sedgwick County District Court and went to the home of a daughter of respondent in Elkville, Illinois.

"4. That her going to the home of respondent's daughter was pursuant to plan conceived and executed by Luis Trugillo and respondent's wife.

"5. That, as a part of the scheme to conceal Carmen and remove her from the jurisdiction of the court, respondent's wife wrote a note which was intended to be and was used by the girl as a model when she wrote a note stating she was returning to her mother; when, as a matter of fact, she had gone to the home of the daughter of respondent and his wife.

"6. That respondent received from Trugillo the note written by Carmen and he, at that time, did not know the note had been written as a part of a scheme to circumvent the orders of the court and believed the statement therein contained—that the girl had gone to her mother—was true.

"7. That respondent did, within a few days after receiving said note, advise opposing counsel, William Atwater, of the receipt thereof, but did not so advise the trial judge, Honorable I. N. Williams.

"8. That at some time thereafter and prior to April 3, 1945, respondent acquired at least some knowledge of the improper removal of Carmen from the jurisdiction of the court.

"9. That on April 3, 1945, respondent stated in open court that he did not then know the whereabouts of Carmen. That said statement was technically true in that he did not at that time know, by means of evidence admissible in court, the exact whereabouts of said girl, but his statement to the court was

incomplete and unfair to the court in that he did not advise the court he was in possession of knowledge or at least some information, to the effect that the girl either was or had been at the home of his daughter in Elkville, Illinois.

"10. That respondent has been punished for this misconduct in contempt proceedings had in the District Court of Sedgwick County, Kansas, Division No. 4."

### "CONCLUSIONS OF LAW

"1. That respondent is guilty of having willfully violated the oath and duty imposed upon him as an attorney at law.

"2. That by reason thereof respondent is subject to punishment herein by disbarment from practicing law, suspension from practicing law, or other punishment which this Honorable Court might deem appropriate."

### "RECOMMENDATION

"This lawyer has already been punished once in contempt of court proceedings. As far as this record is concerned or discloses, he accepted the final punishment imposed because of an understanding, if not a gentlemen's agreement, by so doing he would finally dispose of this matter. He has had a cloud hanging over him by reason of these contempt proceedings and disbarment proceedings for about two years.

"The transcriptions of record of previous proceedings clearly disclose a considerable amount of expense has been incurred. The court costs in this case will be quite substantial. Hence, your Commissioner feels payment of the costs of this proceedings, in addition to the punishment he has already endured, together with the damage to his professional standing he will suffer in the future regardless of the outcome of this proceeding, quite adequately punishes respondent for the unprofessional conduct of which he has been found guilty.

"It is, therefore, recommended that an order be entered herein assessing the costs of this action against the respondent and suspending him from the practice of law until such costs are paid and that, upon the payment of said costs in full, an order be entered herein reinstating respondent's right to practice law."

The report of the commissioner discloses that in reaching his decision he did not consider the judgment of the district court finding respondent guilty of contempt and did not consider certain testimony from other previous hearings before the district court.

Counsel for respondent challenges the validity of the contempt proceeding. He urges that proceeding was void for lack of jurisdiction over the person of the respondent. In view of the record in that proceeding the merit of the contention may be doubted but we shall not pursue the point. The accuser does not rely upon the contempt judgment as a ground for disbarment. Concerning the contempt proceeding we, however, pause to state that whatever understanding may have existed, if any, that payment of the reduced fine

assessed in the contempt proceeding should end the entire incident, such understanding could in nowise bind the board of law examiners, not a party thereto. In no event could it preclude the board from performing its statutory duty of instituting a disbarment proceeding if it concluded such action was necessary or proper.

Respondent objects to findings of fact No. 8 and No. 9, to the conclusions of law and to the recommendation of the commissioner that the costs of the proceedings be taxed against respondent and that he be suspended from the practice of law until the costs are paid.

The accuser objects to the commissioner's finding No. 10 on the ground it does not constitute a finding of fact but a conclusion and is not supported by the evidence. The accuser moves that this court adopt both conclusions of law but objects to the recommendation of the commissioner and moves that respondent be disbarred with leave granted to apply for reinstatement at the close of such time as the court shall deem reasonable.

Reports of commissioners are, of course, only advisory in character. Final responsibility for an appropriate judgment rests with this court. (G. S. 1935, 7-115, 7-116; *State, ex rel., v. McKnaught,* 152 Kan. 689, 690, 107 P. 2d 693; *State, ex rel., v. Sage Stores Co.,* 157 Kan. 404, 411, 141 P. 2d 655.)

Two grounds for disbarment or suspension specified by G. S. 1935, 7-111, are:

"1. For willful disobedience of an order of court requiring him to do or forbear an act connected with or in the course of his profession. 2. For a willful violation of his oath, or of any duty imposed upon an attorney at law."

We think it unnecessary to narrate all the various facts disclosed by the record. Circumstantial evidence is frequently as convincing as the direct testimony. That is true in the instant case. We shall assume respondent did not violate a direct order of the court.

But what about the second ground? After the district court had denied respondent's motion for a change of custody of the fourteen-year-old daughter, Carmen, respondent stated he desired to file a motion for a new trial. Pending the ruling on that motion he indicated he did not want the probation officers to remove the child to the Home of the Good Shepherd in Kansas City where the court had ordered her to be taken. It was upon respondent's special request that the child was permitted to be left in the home of Robert Lemon, a former client of respondent. Manifestly the court's com-

pliance with such a request placed a heavy responsibility on respondent to make certain the child was in the jurisdiction of the court when a ruling was had on the motion for a new trial. Certainly the court's compliance with respondent's request carried with it an implied order, and an acceptance thereof, that the child would be present when needed. The fact respondent's wife and the father of the child may have been the instigators in promptly spiriting the child out of the jurisdiction of the court does not constitute a very satisfactory defense to respondent's failure to produce the child under the circumstances. This responsibility on the part of respondent existed without any special announcement thereof. It, however, appears the court desired to emphasize that fact when it yielded to respondent's request to leave the child in the home of the Lemons. The court, among other things, said:

"Mr. Cox, what you and I and everyone else in this case must look to is the welfare of this little girl. That is all the Court is concerned with, *and that is all you should be concerned with.*" (Our italics.)

Within forty-eight hours the child was surreptitiously removed and taken to the home of respondent's daughter in Elkville, Ill., where she remained for several weeks. Respondent's daughter notified Mrs. Cox by telephone at Wichita of the child's arrival in Illinois. About two weeks later Mrs. Cox went to Elkville, Ill., in response to another telephone call from her daughter for the purpose of advising and assisting in determining what to do with the child. Mrs. Cox wrote a letter to her husband. That letter was not produced in the instant hearing. In that envelope was contained a sealed letter which Mrs. Cox asked respondent to deliver to Trugillo, his client in the child-custody case. Respondent delivered it. The name of the addressee was omitted. The enclosed letter delivered by respondent to Trugillo began thus:

"Dear Mr.

"I have not written before because I first wanted to take time to see the reactions, attitudes and facts; First I'll start with reports on the time before I arrived, part of them at least, will report others when I see you."

Another portion thereof read:

"We are trying to make some sort of arrangement for a school transfer from here, may not be able to do it. But whether we can or not I think you should make arrangements right away with one or the other of those people a good many miles away, not close, understand? If I knew the name and address on beyond here I'd take her if you'd pay my expenses to do it, and if it could be done by next week end. I can't stay away from home longer than that. Or

if you wanted her to go to Celia (is that right?) I'd take her south out of here and see her on her way if you'd tell me to whom and where."

Another portion read:

"If it were only so I could have her I could do anything with her and she knows it. I am sending you an expense acc—you can see how you stand on it."

The letter closed as follows:

"If it is safer and I think it would be, send me the names and addresses & letters here by registered mail *thru the man who gives you this..* And be as quick as you can—for I can't stay much longer." (Our italics.)

Respondent admitted he acted as the intermediary between his wife and his former client but said he did not read the enclosed letter or hear it read. Respondent, however, also admitted that never before had his wife sent him a letter to any client and that he and his wife had no habit of keeping secrets from each other. Trugillo stated respondent gave him a key to the men's wash room and advised him to read the letter there and to destroy it. Respondent denied this. (See, also, commissioner's findings Nos. 5, 6, 7 and 8.)

Respondent testified that "On Monday following the girl leaving the Lemons I told Bill Atwater [who was attorney for the girl's mother in the custody proceedings] I had a letter stating that she had gone to her mother. *He* [Atwater] *told me that she had not gone back to her mother.*" (Our italics.)

Notwithstanding this knowledge respondent acquired from Mr. Atwater the Monday after the girl disappeared, that she had not gone to her mother, respondent failed to notify the trial court concerning the child's disappearance.

On April 3, 1945, the trial court held a hearing to obtain information concerning the whereabouts of the child. It called respondent into court. The court requested that Mr. Cox produce the note which was reported to have been left at the Lemons' home by the girl before her departure. That was a note respondent's wife had prepared for the child to copy and leave with the Lemons. It was a part of the scheme for the removal of the child. Respondent produced the note. The record discloses the following:

"Mr. Cox: I want the protection of having this note turned back to me. I don't want it turned over to someone else.

"The Court: Now, Mr. Cox, will you make a statement of how you obtained the letter?

"Mr. Cox: I don't recollect but I think Mr. and Mrs. Lemon gave it to me. I don't know. I think I went down there when this matter of this child came up.

"The Court: What did you do?

"Mr. Cox: I kept it.

"The Court: Well, in regard to the little girl, did you make any investigation as to where the little girl was?

"A. No, I didn't make any investigation at all, except I talked to Bill, here. (Indicating Mr. Attwater.)

"The Court: *Do you know anything about her?*

"Mr. Cox: *No.*

"The Court: Have you heard from her?

"Mr. Cox: No.

"The Court: Have you made any investigation?

"Mr. Cox: No, I haven't made any investigation.

"The Court: Have you talked to Mr. Trugillo about her?

"Mr. Cox: Well, I talked to him some, yes.

"The Court: Did he tell you anything about where she was?

"Mr. Cox: Where she was; no, he hasn't told me anything about where she was.

"The Court: Did he tell you about having investigated as to her whereabouts?

"Mr. Cox: I don't know. He told me he was worrying about where she was and wondered where she was."

(Our italics.)

The commissioner in discussing the evidence stated in part:

"In my opinion, the evidence, both direct and circumstantial, wholly fails to prove any complicity by respondent in the making or carrying into effect of these plans. The evidence, in my opinion, does clearly and satisfactorily, if not conclusively, prove respondent had guilty knowledge of what was being done by his client and his wife. That he mentally approved of what was being done, is not so clearly disclosed. The circumstances would indicate a major portion of the plan had been executed before he had any knowledge of its conception and his silence after learning of what was being done might indicate either tacit approval of what was being done, provided he did not become involved, or might simply mean that his wife's involvement in the matter induced him to remain silent at a time when he should have spoken. It does not seem reasonable that he would act as an intermediary in delivering a letter or letters from his wife to Trugillo without knowing something about why these letters were being written. Furthermore, it doesn't seem reasonable that at no time did his wife, after returning from Illinois, say anything about the presence of Carmen at the home of their daughter.

"Hence, it is the opinion of your Commissioner that from the circumstances developed from evidence to which credence should be given, it was satisfactorily and clearly shown he had some knowledge of what was being done by his wife and his client."

We shall not labor the subject of respondent's guilty knowledge. An examination of the entire record convinces this court the commissioner was clearly justified in his views of respondent's guilty

knowledge of the wrongful removal of the child. The commissioner's findings on that subject are approved.

We have no hesitancy whatsoever in concluding that, under the facts of this case, respondent's failure to promptly notify the trial court of the child's disappearance and concerning all suspicions he might have relative to any scheme for her wrongful removal constituted a violation of his oath and the duties imposed upon him as an attorney at law. No lawyer has the right to permit any person, not even his wife, to so undermine his professional standing. It is wholly inconceivable respondent was unaware of some of his wife's unjustifiable conduct. Such awareness required that he inform the court. (*In re Gorsuch,* 113 Kan. 380, 382, 214 Pac. 794.) This is particularly true in a case, such as this, where the court called respondent and interrogated him concerning any information he might have with respect to the child. No desire, if any, to protect his wife could justify his refusal to make full and complete disclosure to the court of any information he may have had.

The right to practice law is a privilege or franchise subject to the control of the legislature. While functioning by virtue of such privilege a lawyer is a quasi-public official. (*In re Casebier,* 129 Kan. 853, 856, 284 Pac. 611.) While he does not hold an office or public trust in the constitutional or statutory sense of that term he is nevertheless an officer of the court and as such has an obligation to the public no less significant than his obligation to his client. (*In re Hanson,* 134 Kan. 165, 170, 5 P. 2d 1088.) His privilege to engage in the practice of law in the courts carries with it a duty to assist in the administration of justice. He is a part of the machinery provided by government in the performance of its functions in administering justice. *(In re Macy,* 109 Kan. 1, 8, 196 Pac. 1095; *In re Gorsuch,* supra, p. 384; *In re Learnard,* 121 Kan. 596, 600, 249 Pac. 606.) To the extent he fails to perform that duty he undermines and endangers the true purpose and functions of government.

If the dignity of and respect for the legal profession is to be maintained and the integrity of the courts is to be preserved courts simply dare not pass unnoticed misconduct of lawyers inimical to the administration of justice. A judgment is a finality in the process of administering justice. Until a judgment is reversed or modified in a legal manner it must be recognized by lawyers in the case as binding them as well as their clients. Nothing could be more de-

structive to the judicial process than the circumvention of judgments through illegal or devious methods. Manifestly the failure of a lawyer in a case to report such action to the court, especially when the court interrogates him concerning it, constitutes a violation of the lawyer's oath, of the duties imposed upon him and falls squarely under the second ground of the disbarment statute previously quoted.

In passing we may also say the grounds for the revocation or suspension of an attorney's license to practice law are not restricted to those expressly enumerated in the disbarment statute. (*In re Smith,* 73 Kan. 743, 85 Pac. 584; *In re Hanson,* supra, p. 170.)

Counsel for accused contends the evidence does not support the precise charge as framed in the accusation. The contention is too technical. Neither the accused nor his counsel has been misled or prejudiced in any manner.

Counsel for accused also directs our attention to the fact that in cases of this character more than a mere preponderance of evidence is necessary, citing *In re Smith,* supra. The commissioner was fully aware of the rule. We agree with the commissioner's conclusion the evidence was sufficient under the rule to sustain disbarment.

Counsel for accused also quite properly refers to the names of various lawyers of ability and excellent reputation in the city of Wichita who testified concerning the good reputation of the accused. It appears the accuser is correct in asserting such attorneys were not conversant with the facts of this particular case. At any rate we are by no means disregarding their testimony. It has received our consideration in determining the nature of the judgment to be rendered.

Obviously the performance of our duty in cases of this character is not a pleasant one. It is seldom, if ever, easy to determine exactly what judgment should be rendered in them. We are fortunate in having the report of a practical, able and considerate commissioner. The board of law examiners, composed of men of recognized ability and experience, is in no sense vindictive. It desires only to do its duty, to reasonably protect the good name of the legal profession and the respect of the public for the courts of this state. That board and the commissioner are not far apart in their recommendations.

Counsel for the accused ably seeks to clear his client entirely.

That, as previously indicated, we cannot do. All factors considered it is the judgment of this court that respondent be disbarred from the practice of law; that a motion to reinstate will not be entertained prior to six months from this date and that respondent be required to pay the costs of the proceeding.

: BURCH, J., not participating.

---

"ACCUSATION IN DISBARMENT PROCEEDING

*"To The Supreme Court of Kansas:*

"1. The State Board of Law Examiners of the State of Kansas, consisting of A. M. Keene, Chairman; Fred Robertson, Raymond Rice, F. W. Lilleston, and T. M. Lillard, Secretary, having had under investigation and consideration certain charges against Kenneth K. Cox of Wichita, Kansas, an attorney at law, who previous to the occurrence herein recited was admitted to practice as such in all of the courts of the State of Kansas, and having found reasonable grounds for believing that said Kenneth K. Cox, such attorney at law, is guilty of willfull violations of his oath of office and of the duties imposed upon him as such attorney at law, and having found that reasonable grounds exist for his disbarment as such attorney at law, and that his guilt of the charges made can be proved, does hereby make and present against said Kenneth Cox accusations as follows:

"2. First, Willful disobedience of an order of the Court requiring him, said Kenneth K. Cox, to do and forbear an act connected with and in the course of his profession, by conniving and assisting in sending Carmen Trugillo to his daughter's home in Elkville, Illinois, in violation of an order of the Court which is more fully set out hereafter in paragraph four.

"3. Second, Willful violation of his oath and duty imposed upon him as an attorney at law in this, that on the 3d day of April, 1945, in the case hereinafter named, the said Kenneth K. Cox advised the Court that he did not know the whereabouts of Carmen Trugillo, when in truth and in fact he did know; as shown by the statement in paragraph four hereafter set out, and in advising the defendant, Luis Trugillo, to testify falsely with reference to the whereabouts of his daughter Carmen Trugillo, all as more fully set out hereafter in paragraph four.

"4. That on or about January 11, 1945, a case was pending in the Fourth Division of the District Court of Sedgwick County, Kansas, before I. N. Williams, Judge of said Court, entitled, *In re: Oletha Trugillo v. Luis Truglllo,* No. 96075, in which case the custody of a child fourteen years old, named Carmen Trugillo, which was a ward of the court, was involved, and in which case the above named Kenneth K. Cox was the attorney for the above named Luis Trugillo, father of said child. After the hearing an order was made by the court directing that the child be sent to the House of the Good Shepherd in Kansas City, and also directing that the child be placed in the care of Mr. and Mrs. Robert Lemon, 1003 South Washington, in Wichita,

Kansas, while Mrs. Smith of the Probate Court made the necessary arrangements to send her to Kansas City. The father, Luis Trugillo, and his attorney, Kenneth K. Cox, resented this order, and while Carmen Trugillo was in the custody of Mr. and Mrs. Robert Lemon, the said Kennith K. Cox filed a motion for a new trial, and later withdrew from the case. Shortly after filing such motion, said child, Carmen Trugillo, disappeared. At a subsequent hearing on April 3, 1945, said Kenneth K. Cox did not appear, but his client, the father of said child, appeared and on the advice of said Kenneth K. Cox, falsely testified that he did not know where said child was; that she had disappeared, leaving a note; that in truth and in fact the child had not disappeared, but on the contrary, the father, under the advice of his attorney, the said Kenneth K. Cox, and his attorney's wife, had sent the child to said Kenneth K. Cox's daughter in Illinois to evade the order of the Court above named, where she was visited by Mrs. Kenneth K. Cox. The child ran away from said Kenneth K. Cox's daughter's home in Illinois and went to Florida and from there to California, where she was located and returned to Wichita and placed in charge of the above named Mrs. Smith of the Juvenile Court, to be sent to Kansas City.

"5. That the said Kenneth K. Cox was by the said court tried, convicted, and sentenced for contempt for the violation of his duty as herein charged, as set forth in the order of the court hereto attached, marked 'Exhibit A' and 'Exhibit B' and made a part hereof. Said Judgment has not been vacated, modified or appealed from.

"WHEREFORE, the said State Board of Law Examiners prays that the certificate and rights of Kenneth K. Cox, as an attorney at law, be canceled and he be disbarred from longer exercising any power or rights thereunder. That it recover its costs and such other relief as it may be entitled to either in law or in equity.

"Chairman, State Board of Law Examiners.

"ATTEST:

"Secretary, State Board of Law Examiners."